

## In The
## Court of Appeals
## Seventh District of Texas at Amarillo

No. 07-22-00032-CV

BAPTIST ST. ANTHONY'S HOSPITAL AND
RHODESIA CASTILLO, M.D., APPELLANTS

V.

DANIEL WALKER AND KRISTEN WALKER, INDIVIDUALLY
AND AS NEXT FRIEND OF H.W., APPELLEES

On Appeal from the 181st District Court
Potter County, Texas
Trial Court No. 110,097-B-CV, Honorable Douglas R. Woodburn, Presiding

November 29, 2022

MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Baptist St. Anthony's Hospital (BSA) and Rhodesia Castillo, M.D. appeal the trial court's denial of their challenge to expert reports and effort to dismiss the suit of Daniel and Kristen Walker, individually and on behalf of their child H, (the Walkers). The three sued BSA and Castillo for alleged negligence occurring shortly before and during the birth of H. The arguments posed are many. They encompass the qualifications of the experts

and whether their reports satisfy the applicable statute. The trial court said they did. We conclude otherwise and reverse.

### *Background*

According to the Walkers, the hospital and doctor breached standards of care relating to the delivery of H and the care of Kristen during labor. The purported negligence encompassed the manner in which BSA, through its nurses, and Castillo monitored the pair and reacted to signs that the health and wellbeing of both patients were jeopardized. The actions and inactions allegedly resulted in H suffering brain trauma due to an asphyxia event, according to the Walkers. They averred in their original petition that if the BSA nurses and Castillo complied with the relevant standards of care and caused Kristen to undergo a cesarean 60 to 90 minutes earlier, then the infant would have suffered no or less injury.

Three reports allegedly supporting their contentions were filed by the Walkers. The documents were written by Drs. Tappan and Null and Nurse Beach. BSA and Castillo moved to dismiss the suit, deeming the reports insufficient. In response, the Walkers filed substitute reports by the same individuals. That led to other motions to dismiss, allegedly because the reports remained deficient. The trial court denied the motions, and this appeal ensued.

### *Law and Application*

Per the Texas Civil Practice and Remedies Code, one pursuing a health care liability claim must serve upon those being sued "one or more expert reports, with a curriculum vitae of each expert listed in the report . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). Service must occur generally within 120 days of the date on which

2

each defendant's original answer is filed. *Id.* Should that not occur, then the physician or health care provider sued is entitled to the dismissal of the suit with prejudice, attorney's fees, and court costs. *Id.* at § 74.351(b). Furthermore, a challenge to such a report may be granted "only if it appears . . . that the report does not represent an objective good faith effort to comply with the definition of an expert report . . . ." *Id.* at § 74.351(l). The legislature defined "expert report" as "a written report by an expert that provides a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* at § 74.351(r)(6). The report illustrates the requisite "good faith effort" when it "'(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit.'" *E.D. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (quoting *Baty v. Futrell*, 543 S.W.3d 689 (Tex. 2018)).

We caution that section 74.351(r)(6) of the Texas Civil Practice and Remedies Code imposes a "lenient standard" assuring the claimant a fair opportunity to show his claim is not frivolous. *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011). In assessing the report's adequacy, we read them as a whole or in their entirety, as opposed to focusing simply on specific portions or sections of it. *Baty*, 543 S.W.3d at 694; *accord, E.D.*, 644 S.W.3d at 667 (noting the obligation to read the report in its entirety). That enables us to parse through the document and reorder its content to understand what the expert says. *See Baty*, 543 S.W.3d at 694 (wherein the Supreme Court viewed "three statements in different sections of the report" in rejecting a challenge to the report). And,

3

that it may lack buzzwords or magic verbiage matters not; such are unnecessary if the information provided satisfies the aforementioned standard. *Baty*, 543 S.W.3d at 693-94. Yet, it may not be conclusory; rather, the expert must "explain" the how and why of his opinions by tying conclusions to specific facts. *Abshire v. Christus Health*, 563 S.W.3d 219, 224 (Tex. 2018). In other words, the expert must "explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Jelinek v. Casas*, 328 S.W.3d 526, 539-40 (Tex. 2010). That said, we turn to the reports at hand.

Many justifiably complain of legalese and the resulting inability of layman to understand terms commonly utilized by the legal community. Lawyers have nothing on doctors. The latter tend to forget they write their health care liability reports for those untrained in the medical field. And, lawyers do little to rectify that.

With the help of dictionaries, we interpret the reports at bar as describing a situation where an expectant mother, while in labor, arrived at BSA. The time was about 5:30 a.m. About three hours later, Castillo prescribed to her Pitocin, a drug used to enhance contractions. Measures to monitor the fetal heart rate had also begun by then. Such monitoring did not include a fetal scalp electrode. Intermittent decelerations in the fetal heart rate were being observed during this period and apparently in conjunction with the contractions. The administration of Pitocin continued; mother's urge to push did not.

Castillo knew of the decelerations and at about 12:08, directed the attending nurse to assist mother in pushing. About 40 minutes later, Castillo decided to leave the hospital, and the nurse did not inform or seek guidance from her superiors about this. Late and variable decelerations of the fetal heart rates persisted, and Castillo was notified of them around 1:52 p.m. The doctor returned to the hospital and mother's bedside by 2 p.m.

4

Monitoring of the fetal heart rate at 3:15 p.m. again revealed variable decelerations and apparently deficient accelerations as the periodic administration of Pitocin continued. By 3:50 p.m., those in attendance noticed swelling of the child's scalp due to "prolonged engagement" in the birth canal. That resulted in Castillo opting to remove the child through cesarean section.

Around 4:33 p.m., mother went to the operating room. The initial incision into mother's abdomen occurred at 4:56 p.m., at which point Castillo discovered the child's head low in Kristen's pelvis. Because she had difficulty in reaching it, the doctor instructed the nurse to "push the head up from below." Delivery ensued. Yet, the child needed to be resuscitated. Ultimately, testing indicated the infant suffered from a "subacute infarction" or stroke "involving the majority of his left cerebral hemisphere." He would be "at potential risk for focal onset seizures and epilepsy," as reported by Tappan.

The Walkers' experts assigned a myriad of defaults to both attending nurses and Castillo. They consisted of 1) both nurses and Castillo failing to apply a scalp monitor to the child's head the morning of mother's arrival; 2) Castillo leaving the hospital and not being "readily available"; 3) an attending nurse failing to contact others higher in "the chain of command" when Castillo left the hospital; 4) Castillo ordering more Pitocin while the child exhibited "non-reassuring fetal heart rate patterns"; 5) the cesarean section not commencing immediately after Castillo decided to perform it; 6) Castillo removing the child from mother's body by having the nurse push on its head as opposed to her pulling its feet; 7) nurses failing to "discontinue the Pitocin and notify the physician" upon seeing certain fetal heart patterns at 9:21 a.m.; and 8) nurses failing to administer terbutaline at 3:52 p.m. when a fetal heart pattern did not respond to a "decrease or discontinuation of

the Pitocin."  As for attempting to explain how these actions or inactions caused harm, Drs. Tappan and Null addressed that.[1]

Null focused on the delay in ultimately conducting the cesarean section.  He opined that H's circumstances were "consistent with an asphyxia event that occurred late in the course of labor" and "[m]ore likely than not had [H] been delivered one to one and a half hours sooner he would not have suffered the degree of brain injury that he has."[2]

Tappan's discussion of causation was a bit longer.  First, he said that "[b]ut for . . . Castillo's failure to deliver by reverse breech extraction, [H] would not likely have suffered these complications and injuries," and it "was foreseeable to an ordinarily prudent obstetrician that failure to deliver by reverse breech extraction might reasonably result in traumatic extraction, physical craniocerebral deformation, and trauma, including the increased risk of arterial ischemic stroke with injury to the fetal brain."  Another of his references encompassed the other purported acts of misfeasance.  There, he said that the "failure to meet the standards of care referred to above was a substantial factor in causing the injuries suffered by baby [H]."  He coupled that with a statement about an "MRI" and "MRA" "suggest[ing] the possibility that [H] sustained a perinatal arterial ischemic stroke likely due to intrapartum factors including prolonged second-stage labor,

---

[1] Nurse Beach rendered no opinion on causation for she, as a nurse, was not qualified to do so. *See Shaw v. West*, No. 07-14-00181-CV, 2014 Tex. App. LEXIS 10715, at *7 (Tex. App.—Amarillo Sept. 24, 2014, no pet.) (mem. op.) (holding a nurse unqualified to opine on causation since she was not a doctor).

[2] Null actually opined that the infant's fetal heart tracing followed by the need for resuscitation, need for assisted ventilation, need to be cooled, his coagulopathy, his seizures, his severe acidosis, and the absence of evidence of infection "are all **consistent with** an asphyxia event that occurred late in the course of labor." (Emphasis added).  To the extent that BSA and Castillo suggest that the phrase "consistent with" is too indefinite to establish causation, Supreme Court authority suggests otherwise.  In *Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 515 (Tex. 2017), the Court found the report sufficiently revealed causation despite the expert saying his interpretation of the x-rays was "'**consistent with** the conditions stated in the death certificate as the cause of Hathcock's death.'" (Emphasis added).

6

fetal heart rate abnormalities, and trauma at the time of delivery, including the forceful external manipulation of the fetal head incident to its impaction in the maternal pelvis." According to Tappan, the child "sustained an in-utero asphyxial injury during the final one to one and a half hours of labor" and had "Castillo decided for cesarean delivery at or about 15:15 and had she "atraumatically" delivered Baby [H] by 15:45 on 05/22/15, [he] would have been born without neurologic injury." He then concluded by stating that "[a]ll the above opinions [were] stated to a reasonable degree of medical certainty on a more probable than not basis."

In short, Drs. Null and Tappan informed the trial court of an impending birth, defaults in monitoring the child, purported misapplication of medications influencing (directly or indirectly) the fetal heart rate, a medical practitioner leaving the hospital for a short period of time, little progress in a birth unassisted by surgery, delay in ultimately removing the child through surgery, purportedly questionable means by which the baby was removed, and the child ultimately suffering brain trauma. That trauma may have been avoided, according to the experts, if the monitoring was better, the doctor acted sooner, and the doctor removed H by pulling on his feet. What is missing is a simple explanation of how and why the misconduct assigned Castillo and the nurses was a substantial factor in H suffering "a large subacute infarction involving the majority of his left cerebral hemisphere." *See Pediatrics Cool Care v. Thompson*, 649 S.W.3d 152, 158 (Tex. 2022) (involving medical malpractice and stating that a defendant's negligence is the cause-in-fact of a plaintiff's injury if the act or omission was a substantial factor in causing the injury, and without, the harm would not have occurred).

7

We assume *arguendo* the reports sufficiently describe the occurrence of an asphyxia event, as we do the discovery of injury at birth. Missing though is adequate explanation tying the purported "asphyxia event" to the "large subacute infarction involving the majority of his left cerebral hemisphere." Whether asphyxia, in general, or the extent allegedly encountered by the unborn child, in particular, can lead to such brain injury was left to inference or speculation. Yet, to be adequate, the report itself "must include the required information within its four corners." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002). We cannot supply it by inference. *Scoresby*, 346 S.W.3d at 556.

At best, Tappan opined that that the presence of a subacute infarction "**suggests the possibility** that H sustained a perinatal arterial ischemic stroke likely due to intrapartum factors including prolonged second-stage labor, fetal heart rate abnormalities, and trauma at the time of delivery . . . ." (Emphasis added). That too is deficient since the mere "possibility" of a link between conduct and eventual harm fails to illustrate the reasonably medical probability demanded by the statute. *Wright*, 79 S.W.3d at 53; *Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P. v. Remington*, No. 04-17-00728-CV, 2018 Tex. App. LEXIS 6387, at *9 (Tex. App.—San Antonio Aug. 15, 2018, no pet.) (mem. op.). The expert must still explain how the conduct caused the injury. *Wright*, 79 S.W.23 at 53.

Nor did either physician explain how or why H's position low in Kristen's pelvis caused either asphyxia or infarction. The same is true regarding the non-application of a monitor on the unborn child's scalp. That default occurred around 9 a.m. while the asphyxia event and brain trauma supposedly "occurred late in the course of labor." Again,

8

we are left to speculate about how either asphyxia or trauma would not have happened had the monitor been affixed earlier. About same omission, we also observe that "[a]n event that starts a chain of events can be too attenuated from an injury to cause it." *Curnel v. Houston Methodist Hospital-Willowbrook*, 562 S.W.3d 553, 565 (Tex. App.—Houston [1st Dist.] 2018, no pet.). This means the experts would have had to also explain why an act transpiring some six or more hours before the occurrence of harm was not too attenuated to the eventual harm. They did not here.

No less is true of Castillo's leaving the hospital for 75 minutes but returning over an hour before deciding to conduct the cesarean. Her leaving may look bad and breach some standard of care, but no one explained why it mattered or how her remaining would have avoided trauma. Regarding the failure of attending nurses to inform their superiors of Castillo's departure, like omissions reappear. We again were left to speculate about what those superiors could or would have done to prevent the subacute infarction had they been told. The experts said nothing about that. Nor did they even address whether those higher up the chain of command had a right to stop Castillo from leaving, persuade her to remain, secure a substitute physician, or the like. *See Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017) (wherein the hospital was accused of negligence because it failed to prevent a patient's transfer and holding causation insufficiently explained because the experts did not address how the hospital had either the right or means to stop it). Nor did they explain what ameliorative measures the hospital could have undertaken while Castillo was gone to preempt H's brain trauma.

9

As for Pitocin/Oxytocin and the way it was administered, the average judge untrained in the field of medicine may garner from the reports a relationship between the drug and contractions. So too may it see accusation about the mis-administration of the substance and comment about contractions influencing fetal heart rates. What it will not see is discussion about how or why the variable heart rates experienced by H before, during, or after the contractions could or would cause asphyxia in general or to a level sufficient to result in an infarction.

About the delay between the time Castillo decided to utilize a cesarean and her initial incision, there was some, no doubt. But, the experts do not provide factual explanation of how or why H would not have suffered the eventual infarction had the surgery commenced post-haste. They seem to conclude as much but offer no factual reasoning to support that conclusion.

And, though it may be foreseeable that pushing on a baby's head during extraction may cause injury, how and why it did in this particular instance was left unaddressed. *See Thompson*, 649 S.W.3d at 158 (stating that proximate cause has two components, cause-in-fact and foreseeability). As with the other alleged acts of mis- and non-feasance, the experts left us to speculate about the link.

So too do the reports leave one to legitimately ask how the asphyxia or infarction was reasonably foreseeable from the alleged defaults other than pushing on H's head. *See Zamarripa*, 526 S.W.3d at 460 (stating that "the causal relationship between breach and injury that an expert report must explain" encompasses both cause-in-fact and foreseeability). With the advent of *Columbia*, the expert report must address both cause-in-fact and foreseeability. *Curnel*, 562 S.W.3d at 569-70. And, as previously mentioned,

10

the only act of misfeasance in relation to which any of the experts discussed foreseeability was the instance of pushing on the baby's head.

No doubt, something happened leaving child and parent to suffer the consequences. But a tragedy does not relieve anyone, including the judiciary, from complying with section 74.351. While the experts at bar proffered a litany of allegedly deficient conduct, they failed to explain how and why each caused, within reasonably medical probability, H's eventual subacute infarction before birth. This makes their reports less than a fair summary allowing jurists to reasonably conclude that either BSA or Castillo caused the harm suffered by H. To the extent that the trial court held otherwise, it abused its discretion. *See E.D.*, 644 S.W.3d at 664 (alluding to the use of an abused discretion standard when reviewing the trial court's decision about the sufficiency of the reports).

We reverse the trial court's order. In its place, we enter our own and dismiss, with prejudice, the Walkers' suit against Rhodesia Castillo, M.D., and Baptist St. Anthony's Hospital. So too do we remand the cause to the trial court with the directive to calculate and award Castillo and the hospital reasonable attorney's fees and court costs per section 74.351(b)(1) of the Texas Civil Practice and Remedies Code.


Brian Quinn
Chief Justice


11