**Opinion issued November 10, 2022.**



In The

# Court of Appeals

**For The**

# First District of Texas

————————————

## NO. 01-22-00003-CV

————————————

**GABRIEL AREVALO, M.D., HAN PHAM HULEN, M.D. P.A. D/B/A WOUND INTEGRITY, HOLLI DEZAUN WALLER, D.O., AND HAROLD DAVID WILLS, D.O., Appellants**

**V.**

**ANA MENDOZA, Appellee**

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-27439**

---

## MEMORANDUM OPINION

Appellant Dr. Harold Wills brings this interlocutory appeal challenging the trial court's denial of his motion to dismiss the healthcare liability claims filed

against him by appellee Ana Mendoza.[1]  Dr. Wills argues the trial court abused its discretion by denying his motion to dismiss because Mendoza's expert reports do not sufficiently address the elements of standard of care, breach, and causation.  We affirm the trial court's orders denying Dr. Wills' motion to dismiss.

## Background

The reports prepared by Mendoza's expert, Dr. John Cascone ("Dr. Cascone"), provide the background facts in this appeal.  The medical records are not before us, and we accept the factual statements in the reports for the limited purpose of this appeal.[2]

---

[1]  Appellee also filed health care liability claims against other physicians, nurse practitioners, and facilities involved in her post-operation treatment including Gabriel Arevalo, M.D. ("Dr. Arevalo"), Han Pham Hulen, M.D. P.A. d/b/a Wound Integrity ("Dr. Hulen"), Holli Dezaun Waller, D.O. ("Dr. Waller"), North Houston-TRMC, LLC d/b/a HCA Houston Healthcare Tomball, Bao Van, M.D. ("Dr. Van"), Lisa Jo Duenes, APRN, CNP, Maria Ella Bacareza Valbuena, APRN, CNP, IPC The Hospitalist Management Company, LLC, IPC Healthcare, Inc., IPC Healthcare Services of Texas, PLLC, IPC PAC Healthcare Services of Texas, PLLC, and THW Emergency Management of Houston, LLC.

Dr. Wills, Dr. Arevalo, Dr. Hulen, and Dr. Waller filed notices of interlocutory appeal from the trial court's denial of their respective motions to dismiss Appellee's healthcare liability claims against them.  Dr. Arevalo, Dr. Hulen, and Dr. Waller filed a motion to dismiss their appeals, which we granted on May 5, 2022.  As a result, Dr. Wills is the only remaining appellant.

[2]  *See Marino v. Wilkins*, 393 S.W.3d 318, 320 n.1 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Shenoy v. Jean*, No. 01–10–01116–CV, 2011 WL 6938538, at *1 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, pet. denied) (mem. op.)).

On May 23, 2019, Mendoza, a 62-year-old woman, underwent an elective hernia repair surgery. Mendoza was transferred to the rehabilitation unit for strengthening and recovery on May 31, 2019. Dr. Bao Van, M.D. ("Dr. Van") was the admitting physician.

On June 6, 2019, the general surgery nurse practitioner, Stacie L. Bohn, NP ("Bohn"), documented that Mendoza's abdominal incision was healing without erythema or drainage. Dr. Gabriel Arevalo, M.D. ("Dr. Arevalo"), a general surgeon, cosigned Bohn's progress note. On June 7, 2019, Mendoza's medical records reflect that she was evaluated by Dr. Van and she was documented as having a temperature of 100.0°F.

On June 8, 2019, at 9:05 a.m., a nursing note in Mendoza's medical records reflects that Mendoza's abdominal surgical site "had approximated wound edges and that there was 'redness around incision site, small area of black skin, near tip of site'" and "moderate yellow exudate with an odor." This description is "consistent with a surgical site infection with foul smelling purulence and skin necrosis." Five hours later, Mendoza was evaluated by nurse practitioner Maria Bacareza Valbuena, N.P. ("Valbuena"). Valbuena documented that Mendoza had "low-grade temp [sic] elevations in the evening" and that nurses had reported erythema and purulent drainage on the abdominal surgical incision site. Valbuena further noted that Mendoza "complained of fevers and that [a] greenish gray strike through was found

on the incision dressing." The plan was to "monitor the incision for signs of infection and obtain a wound [Gram-stain ("GMS")] and culture." Valbuena's progress note, which was cosigned by Dr. Wills, reflects that the "assessment and plan were developed in collaboration with" Dr. Wills.

On June 9, 2019, the results of the wound GMS came back showing "white blood cells (WBC) and Gram-negative rods." According to Dr. Cascone, these findings "are consistent with purulence due to a Gram-negative infection." "Gram-negative rods are typically resistant to multiple antibiotics" and require "more than one antibiotic to cover potential resistance and to cover anaerobic organisms." Nursing notes from later that evening documented that "the abdominal wound edges were *not* approximated and there was green wound exudate." Mendoza was not evaluated by a physician or nurse practitioner on June 9, 2019.

Mendoza was evaluated by Dr. Van and Dr. Arevalo on June 10, 2019. Dr. Arevalo documented that Mendoza's abdominal "incision looks [sic] with signs of necrosis[3] at the center of the wound but not at the confluence of the transverse and longitudinal incisions, however at this site there is secretions with exudate." Dr. Arevalo's plan was to "consult wound care and reassess the need for oral antibiotics." Dr. Van documented that Mendoza "was having abdominal pain keeping her up at night" and nursing notes from that day document that Mendoza's

---

[3] Necrosis is another word for "tissue death."

"abdominal incision had a moderate amount of purulent drainage." That evening, a nurse noted "dark red drainage in the JP drains" and notified Dr. Van that the wound GMS showed WBC and Gram-negative rods.

On June 11, 2019, family practice nurse practitioner Lisa Duenes, N.P. ("Duenes") evaluated Mendoza and documented that Mendoza complained of weakness and had "had green drainage reported from abdominal wound on Saturday." After noting that Mendoza's abdominal wound had a "copious amount of wound drainage," Duenes ordered an infectious disease consult and started Mendoza on an oral dose of the antibiotic Levofloxacin. Dr. Wills cosigned Duenes' progress note.

Mendoza was also evaluated by wound care physician Dr. Holli Waller, D.O. ("Dr. Waller") on June 11, 2019. Dr. Waller noted that Mendoza had "begun to run fevers over the last 3 days" and that the nurse reported a temperature of 101.7°F. Dr. Waller's examination of Mendoza showed "the inferior portion of the wound bandage had strikethrough drainage; the vertical incision line had eschar present under the staples measuring 7.5 cm length x 2.9 cm width; the T portion of the incision had fat exposure measuring 2.6 cm length x 2.3 cm width x 0.2 cm depth; there was no healthy granulation tissue visible; and there was slough present." The tissue surrounding Mendoza's abdominal wound had "erythema and moderate

drainage." Dr. Waller acknowledged that Levofloxacin had been started and an infectious disease consult had been ordered.

Mendoza was examined by infectious disease physician Dr. Brijesh Arvindkumar Raval, M.D. ("Dr. Raval") later that evening. Dr. Raval noted that Mendoza "had fever and possible sepsis due to an abdominal wound infection" and the "wound culture results that showed growth *of P. aeruginosa* and *K. pneumoniae.*" Dr. Raval ordered two sets of blood cultures, continued Levofloxacin, and added intravenous Meropenem, which according to Dr. Cascone, provided "additional Gram-negative coverage for potentially resistant organisms and coverage of anaerobic organisms."

On June 12, 2019, Dr. Arevalo evaluated Mendoza and he documented that her abdominal incision had "signs of necrosis" at the center of the wound and purulent exudate secretions. Dr. Arevalo planned to take Mendoza to the operating room for "abdominal wall debridement of the subcutaneous tissue." Dr. Waller, who evaluated Mendoza in the preoperative holding room, noted that Mendoza "continued to run [a] fever all night and is not feeling quite well." She also noted that Mendoza's wound "remains with 100% covered in eschar," which is "black necrotic tissue" and there was "periwound erythema." Dr. Waller's examination of the inferior abdominal wound revealed "contraction of the wound but with persistent

boggy tissue," no healthy granulation tissue, and moderate to heavy seropurulent drainage.

Dr. Arevalo performed Mendoza's debridement surgery four hours later. According to Dr. Cascone, the "procedure included excisional debridement of necrotic tissue involving the skin, subcutaneous tissue, and debridement of the deep subcutaneous tissue abscess." The abdominal wound contained a "significant amount of dark fluid" and "both necrotic and liquefied fat." "Approximately 5 cm x 2 cm x 5 cm depth of necrotic tissue was removed." The 10 cm deep abscess "had septations and was filled with necrotic tissue." Six days after her surgery, Dr. Raval opined that Mendoza "would need four weeks or more of intravenous antibiotics, depending on the clinical progress of the abdominal wound."

In February 2020, Mendoza was admitted to another hospital for abdominal surgery by plastic surgeon Dr. Anthony Echo, M.D. ("Dr. Echo"). Dr. Echo noted that Mendoza had undergone "numerous adhesion takedowns, debridements, and revisions following her initial surgery [on May 23, 2019]." Mendoza, who was taking oral Amoxicillin, had completed 6 to 8 weeks of intravenous antibiotics, received home health care for wound care, including a wound vac with dressing change 2 to 3 times per week, and she had weekly wound care center clinic appointments. Dr. Echo "performed a debridement of the abdominal wound with mesh removal, the left abdominal fasciocutaneous flap, the right abdominal

fasciocutaneous flap, and placement of an incisional wound VAC (20 square centimeters)." Dr. Echo evaluated Mendoza in June 2020 and documented that she "continued to have abdominal tightness and cramping around the surgical scar, which required her to wear an abdominal binder all day for support."

On May 6, 2022, Mendoza filed health care liability claims against Dr. Wills and other physicians, nurse practitioners, and facilities that involved in her post-operation treatment, claiming that Dr. Wills breached the duty of care to Mendoza by (1) "failing to conduct a thorough history and physical examination to evaluate the source of [Mendoza's] fever;" (2) "failing to conduct a thorough physical examination of the abdominal surgical wound;" (3) "failing to obtain blood cultures; (4) failing to order a chest x-ray;" (5) "failing to order advanced imaging (e.g. CT scan) to access for infection of deep structures including the hernia mesh;" (6) "failing to start empiric intravenous broad-spectrum antibiotics;" (7) "failing to obtain an Infectious Disease consult;" and, (8) "failing to obtain a General Surgery consult.."[4]

---

[4] As previously discussed, Mendoza asserted medical negligence claims against Dr. Van, Duenes, Valbuena, North Houston-TRMC, LLC d/b/a HCA Houston Healthcare Tomball, IPC The Hospitalist Management Company, LLC, IPC Healthcare, Inc., IPC Healthcare Services of Texas, PLLC, IPC PAC Healthcare Services of Texas, PLLC, and THW Emergency Management of Houston, LLC. None of these defendants are parties to this appeal. Although Dr. Arevalo, Dr. Hulen, and Dr. Waller filed notices of interlocutory appeal from the trial court's denial of their respective motions to dismiss Mendoza's healthcare liability claims

## Dr. Cascone's Expert Reports

Pursuant to Section 74.351(a) of the Texas Civil Practice and Remedies Code, Mendoza served a timely report for Dr. Wills, Dr. Van, Valbuena, Dr. Arevalo, Dr. Waller, and Duenes prepared by her expert, Dr. Cascone. With respect to Dr. Wills, Dr. Cascone opined that the applicable standard of care required Dr. Wills to conduct "a thorough history and physical examination to evaluate the source" of Mendoza's fever, and "a through physical examination of the abdominal surgical wound." The standard of care also required Dr. Wills to order blood cultures, a chest x-ray, and "advanced imaging (e.g. CT scan) to access for infection of deep structures including the hernia mesh." Dr. Wills was also required to start "empiric intravenous broad-spectrum antibiotics," and obtain infectious disease and general surgery consultations.

Dr. Cascone opined that Dr. Wills breached the standard of care on June 8, 2019 by not (1) examining Mendoza's abdominal wall incision, (2) ordering blood cultures, (3) ordering advanced imaging of Mendoza's abdomen, (4) starting Mendoza on empiric intravenous broad-spectrum antibiotics, (5) obtaining an infectious disease consult, and (6) obtaining a general surgery consult.

---

against them, Dr. Arevalo, Dr. Hulen, and Dr. Waller subsequently filed a motion to dismiss their appeals, which we granted on May 5, 2022.

With respect to causation, Dr. Cascone opined that these "failures led to a failure to identify, curtail, and address developing infection." As Dr. Cascone explained,

> The failure to identify and curtail developing infection led to worsening of the abdominal surgical wound infection and abscess causing involvement of the abdominal cavity and hernia mesh along with worsening of the abdominal wound necrosis. This worsening, led to intraabdominal abscess formation that became a 10 cm abscess by June 12, 2019. The development of a 10 cm intra-abdominal abscess necessitated multiple abdominal surgeries for wound debridement, abscess debridement, and lysis of adhesions. These surgeries led to the formation of intra-abdominal adhesions, formation of abdominal wall scar tissue and damage of abdominal wall nerve tissue. Adhesions, scar tissue, and damage to nerve tissue cause permanent abdominal pain and neuropathy.

Dr. Cascone further opined:

> Had Ms. Mendoza's abdominal wall incision been examined, blood cultures been ordered; and advanced imaging of the abdomen been ordered, the infection would have been identified. Had empiric intravenous broad-spectrum antibiotics been started the developing infection would have been curtailed. Had infectious disease consult and a general surgery consult been obtained the developing infection would have been addressed through debridement.

> Had Dr. Wills and NP Valbuena undertaken the above measures, on June 8th, the developing infection would have been found, curtailed, and addressed. Had the developing infection been found, curtailed, and addressed on the 8th, there would be no worsening over the next several days of the abdominal surgical wound infection and abscess causing involvement of the abdominal cavity and hernia mesh along with worsening of the abdominal wound necrosis. Had this worsening not occurred, a 10 cm intra-abdominal abscess would not have grown and existed on June 12, 2019. Had the 10 cm intra-abdominal abscess not existed, there would be no need for multiple abdominal surgeries for wound debridement, abscess debridement, and lysis of adhesions. If

these surgeries had not occurred, Ms. Mendoza would not have experienced the formation of intra-abdominal adhesions, formation of abdominal wall scar tissue and damage of abdominal wall nerve tissue. If Ms. Mendoza had not experienced adhesions, scar tissue, and damage to nerve tissue, she would not now have permanent abdominal pain and neuropathy.

After Dr. Wills objected to the adequacy of Dr. Cascone's opinions on standard of care, breach, and causation, Mendoza voluntarily served a supplemental report by Dr. Cascone. In his supplemental report, Dr. Cascone explains that "[t]he subject matter of surgical site infection diagnosis and treatment is recognized and developed in multiple fields of practice, including infectious disease and those of every named physician in this claim" including Dr. Wills. Dr. Cascone further states:

> The standards of care I previously enunciated, and will again detail below, are not standards of care for a specialized field or area of medical services. Rather, the standards of care I opine on regarding this claim—standards of care for surgical site infection diagnosis and treatment—are basic medical skills learned by all physicians as part of their basic medical training and are required of all physicians regardless of whether they received specialized, additional, or advanced education and training. The identified, specific actions that should be taken—the applicable standard of care—varies upon the circumstances, circumstances that the individual physician happens upon at the time they are rendering care.

With respect to Dr. Wills, Dr. Cascone reiterated the same standard of care and breach he set forth in his initial report. Dr. Cascone further stated that as a cosigner of nurse practitioner notes, Dr. Wills was also required to develop an

assessment and plan for Mendoza's care in collaboration with the nurse practitioner

that fulfilled the standard of care.

> Per Ms. Mendoza's HCA medical records, page 257, the progress note documents that the assessment and plan were developed in collaboration with Dr. Wills. N.P. Valbuena developed the plan in collaboration with Dr. Wills. The plan does not prescribe actions that fulfill the standard of care. As I stated in my prior report, there was a failure to examine the abdominal wall incision; a failure to order blood cultures; a failure to order advanced imaging of the abdomen; a failure to start empiric intravenous broad-spectrum antibiotics; a failure to obtain infectious disease consult; and a failure to obtain a general surgery consult. The plan of care did not meet the standard of care and Dr. Wills participated in the development of this plan.

In his supplemental report, Dr. Cascone described the pathophysiology of

Mendoza's surgical site infection:

> A surgical site infection occurs when microbial contamination of a surgical wound causes the development of inflammation and infection. The body's host defenses attempt to eradicate the infection by recruiting white blood cells (WBC) to the surgical site in an attempt to stop bacteria replication and eradicate the presence of bacteria from the surgical site. The combination of WBCs and bacteria causes the development of purulence. The surgical wound inflammation and purulence causes the formation of abscess, adhesions, and tissue death (i.e. necrosis). The necrosis facilitates bacterial replication and inflammation. If the surgical wound inflammation, necrosis, and purulence are left untreated or are not properly treated then the infection will continue to progress leading to growth of the abscess and more adhesion formation. In addition, systemic inflammation (e.g. fever) can develop. If the infection continues to progress then the body may develop a dysregulated inflammation causing sepsis.

With respect to causation, Dr. Cascone further opined

> To dovetail my original report, the infection will progress and worsen if it is not properly identified, curtailed, and addressed. This worsening

development as detailed in the preceding paragraph is progressively occurring continuously and for this reason, each identified breach contributed to and is causally linked to Ms. Mendoza's injuries regardless of when the breach occurred. While the end result was a 10 cm abscess on June 12, 2019, which in turn necessitated multiple surgeries resulting in permanent abdominal pain and neuropathy, this end result was the product of the progressive, continuous process detailed above. The 10 cm abscess did not occur or form overnight. It was permitted to progressively form, beginning on June 7, 2019, and continuing through June 12, 2019, due to a failure to identify, curtail, and address the continuously and progressively worsening infection. Each individual breach of the applicable standards, alone and in combination, contributed to the end result because of the continuously and progressively worsening pathophysiology of a surgical site infection. Each breach—regardless of when the specific breach occurred—led to a failure to identify, curtail, or address the infection properly. The fact that Ana's infection continuously and progressively worsened is the result of each of those failures.

Dr. Wills filed a motion to dismiss and objections to Dr. Cascone's supplemental report. Dr. Wills argued Dr. Cascone's supplemental report failed to cure the deficiencies of the initial report because it continued to apply identical standards of care to each provider, regardless of their role and made a more detailed, yet still conclusory opinion on causation.

On December 13, 2021, the trial court denied Dr. Wills' objections to Dr. Cascone's expert report and Dr. Wills' motion to dismiss. This interlocutory appeal followed.

## Chapter 74 Expert Reports

Dr. Wills argues the trial court abused its discretion in denying his motion to dismiss Mendoza's health care liability claims against him because Dr. Cascone

failed to provide a fair summary of his opinions regarding the standard of care applicable to Dr. Wills, the manner in which the care rendered by Dr. Wills failed to meet that standard, and the causal relationship between that alleged failure and the injuries claimed. According to Dr. Wills, Dr. Cascone's opinions with respect to standard of care and breach are insufficient because Dr. Cascone does not explain why he applies the same standard of care to all defendants, regardless of their practice area and role in Mendoza's care, and because Dr. Cascone's opinion on the applicable standard of care is inaccurate because it conflicts with the facts set forth in his reports and does not account for the fact that Dr. Wills' treatment of Mendoza was limited to his role as cosigner of the nurse practitioners' progress notes. Dr. Wills further contends that Dr. Cascone's opinion with respect to causation is insufficient because it is conclusory and fails to link his specific conduct to Mendoza's alleged injury.

## A.    Applicable Law

Chapter 74 of the Texas Medical Liability Act ("TMLA") requires a health care liability claimant to serve each defendant health care provider with an adequate expert report no later than the 120th day after the defendant filed its original answer. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (*l*), (r)(6); *see generally E.D. by & through B.O.*, *Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022). By doing so, Chapter 74 serves as a gatekeeper through which no medical negligence

cause of action may proceed unless the plaintiff has made a good-faith effort to demonstrate that a qualified medical expert believes that a defendant's conduct breached the applicable standard of care and caused the claimed injury. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6); *see generally E.D. by & through B.O.*, 644 S.W.3d at 664.

To accomplish this goal, the TMLA requires a health care liability claimant to "serve on [a defendant] or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted" to substantiate her claims. TEX. CIV. PRAC. & REM. CODE § 74.351(a); *see E.D. by & through B.O.*, 644 S.W.3d at 662; *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018). An expert report is adequate if it makes an objective good-faith effort to provide a fair summary of the expert's opinions as of the date of the report regarding (1) the applicable standards of care, (2) the manner in which the care rendered by the defendant physician or health care provider failed to meet the standards, and (3) the causal relationship between that failure and the injury, harm, or damages claimed by the plaintiff. TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6); *see E.D. by & through B.O.*, 644 S.W.3d at 662.

To constitute a good -faith effort, the report must provide enough information to fulfill two purposes: (1) inform the defendant of the specific conduct that the

plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claim has merit. *See E.D. by & through B.O.*, 644 S.W.3d at 664 (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)). A report that merely states the expert's conclusions about standard of care, breach, and causation is conclusory and does not fulfill these two purposes. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). The expert must explain the basis for his statements and link his conclusions to the facts. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). In determining whether the report meets those requirements, the court should look no further than the report itself, because all the information relevant to the inquiry must be contained within the report's four corners. *See id.* (citing *Palacios*, 46 S.W.3d at 878); *see also Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (stating four-corners requirement "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended"). Courts must view the report in its entirety, rather than isolating specific portions or sections, to determine whether it is sufficient. *See Baty*, 543 S.W.3d at 694; *see also Austin Heart, P.A.*, 228 S.W.3d at 282 ("The form of the report and the location of the information in the report are not dispositive.").

"While an expert's report must not be conclusory, the court's skepticism about the expert's opinion does not render it so." *See E.D. by & through B.O.*, 644 S.W.3d

at 667 (citing *Abshire*, 563 S.W.3d at 226). "The 'fair summary' benchmark is not an evidentiary standard, and at this early stage of the litigation, 'we do not require a claimant to present evidence in the report as if it were actually litigating the merits.'" *E.D. by & through B.O.*, 644 S.W.3d at 667 (quoting *Abshire*, 563 S.W.3d at 226). Thus, the accuracy and reasonableness of the expert's opinions are not relevant to the analysis of whether his opinion constitutes a good-faith effort to meet the statute's requirements. *See Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 516–17 (Tex. 2017) (stating reasonability of expert's opinion "is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort"); *see also Abshire*, 563 S.W.3d at 226 (stating evidentiary value of expert's opinions "is a matter to be determined at summary judgment and beyond"); *Holt v. Holt*, No. 01-17-00008-CV, 2017 WL 3483211, at \*3 (Tex. App.—Houston [1st Dist.] Aug. 15, 2017, pet. denied) (mem. op.) ("The court's role is not to determine the truth or falsity of the expert's opinion, or the facts upon which the expert bases such opinions, but to act as a gatekeeper in evaluating the sufficiency of the report itself.") (citing *Mettauer v. Noble*, 326 S.W.3d 685, 691 (Tex. App.—Houston [1st Dist.] 2010, no pet.)).

When a plaintiff serves an initial expert report and a supplemental report, we consider the reports together when assessing whether the plaintiff made a good-faith effort to demonstrate that a qualified medical expert believes that a defendant's

conduct breached the applicable standard of care and caused the claimed injury, as required by Chapter 74. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(i) (allowing expert reports to be considered together in determining whether adequate expert report has been served); *Methodist Hosp. v. Shepherd–Sherman*, 296 S.W.3d 193, 196 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (considering expert's initial and supplemental reports together in assessing plaintiff's compliance with Chapter 74).

## B.     Standard of Review

We review a trial court's ruling on a Chapter 74 motion to dismiss for an abuse of discretion. *See Baty*, 543 S.W.3d at 692 (citing *Palacios*, 46 S.W.3d at 878). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *See Wright*, 79 S.W.3d at 52. We may not substitute our own judgment for that of the trial court merely because we would have ruled differently. *Id.*; *see also Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). When reviewing decisions for an abuse of discretion, "[c]lose calls must go to the trial court." *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006).

We conduct our review keeping in mind that Chapter 74's expert report requirements are intended to deter frivolous claims, not to dispose of claims regardless of their merit. *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011);

*see also Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013) ("The Legislature's goal was to deter baseless claims, not to block earnest ones."); *Henry v. Kelly*, 375 S.W.3d 531, 535 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (noting Texas Supreme Court "has encouraged trial courts to liberally construe expert reports in favor of plaintiffs").

## C.     Adequacy of Dr. Cascone's Reports as to Standard of Care and Breach

Dr. Wills argues the trial court abused its discretion by denying his motion to dismiss because Dr. Cascone's expert reports do not sufficiently address the elements of standard of care and breach. According to Dr. Wills, Dr. Cascone's opinions on these elements are insufficient because Dr. Cascone initially "applied identical standards of care to all defendants, regardless of their role in the patient's care" and then "attempted to cure this deficiency by stating that the identical standard of care articulated is the same for 'any physician' and 'any nurse practitioner.'" Dr. Wills argues that Dr. Cascone's opinion is conclusory because he does not explain why identical standards of care apply to multiple defendants. Dr. Wills further contends that Dr. Cascone's opinion on the applicable standard of care is inaccurate because it conflicts with the facts set forth in his reports and does not account for the fact that Dr. Wills' treatment of Mendoza was limited to his role as cosigner of the nurse practitioners' progress notes.

## 1. Applicable Law

Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880. Identifying the standard of care is critical because "[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Id.* "While a fair summary is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." *Id.*; *see also Abshire*, 563 S.W.3d at 226 (noting that to identify standard of care adequately expert report must set forth "specific information about what the defendant should have done differently"). When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant. *See Univ. of Tex. Med. Branch v. Railsback*, 259 S.W.3d 860, 864 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

## 2. Analysis

In his supplemental report, Dr. Cascone explains that "[t]he subject matter of surgical site infection diagnosis and treatment is recognized and developed in multiple fields of practice, including infectious disease and those of every named physician in this claim" including Dr. Wills, and Dr. Cascone reiterates that the standards of care he identifies in his reports "are not standards of care for a

specialized field or area of medical services." Dr. Cascone opines that the "standards of care for surgical site infection diagnosis and treatment . . . are basic medical skills learned by all physicians as part of their basic medical training and are required of all physicians regardless of whether they received specialized, additional, or advanced education and training." Dr. Cascone further states that the "identified, specific actions that should be taken—the applicable standard of care—varies upon the circumstances, circumstances that the individual physician happens upon at the time they are rendering care."

Dr. Cascone states in his initial report that Mendoza, who had been running a fever and whose abdominal surgical incision exhibited signs "consistent with a surgical site infection with foul smelling purulence and skin necrosis," "had indisputable signs and symptoms of a post-operative surgical site infection and wound necrosis on June 8, 2019." Dr. Cascone opines that the applicable standard of care required under such circumstances required Dr. Wills to (1) conduct a thorough history and physical examination of the patient, including examination of the surgical wound, to evaluate the source of the patient's fever, (2) order blood cultures, a chest x-ray, and "advanced imaging (e.g. CT scan) to access for infection of deep structures including the hernia mesh," (3) start the patient on "empiric intravenous broad-spectrum antibiotics," and (4) obtain infectious disease and general surgery consultations.

Dr. Cascone further opines that Dr. Wills breached these standards of care on June 8, 2019 by not (1) examining Mendoza's abdominal wall incision, (2) ordering blood cultures, a chest x-ray, and advanced imaging of Mendoza's abdomen, (3) starting Mendoza on empiric intravenous broad-spectrum antibiotics, and (4) obtaining infectious disease and general surgery consultations.

After reviewing the reports in their entirety, we conclude that Dr. Cascone's reports inform Dr. Wills that, as a physician rendering care to a post-surgical patient who presents with a fever and signs of an abdominal surgical site infection, Dr. Wills has a duty to conduct a thorough history and physical examination of the patient, including examination of the surgical incision, order blood cultures, a chest x-ray, and advanced imaging of the patient's abdomen, start the patient on "empiric intravenous broad-spectrum antibiotics," and obtain infectious disease and general surgery consultations. Dr. Cascone's reports also inform Dr. Wills how he believes Dr. Wills breached those standards of care on June 8, 2019, namely, by not (1) examining Mendoza's abdominal wall incision, (2) ordering blood cultures, a chest x-ray, and advanced imaging of Mendoza's abdomen, (3) starting Mendoza on empiric intravenous broad-spectrum antibiotics, and (4) obtaining infectious disease and general surgery consultations. Having done so, Dr. Cascone's reports inform Dr. Wills of the specific conduct he has called into question and provide Dr. Wills with a fair summary of Dr. Cascone's opinions concerning how Dr. Wills failed to

meet the applicable standards of care with respect to his role in Mendoza's post-surgical care. *See E.D. by & through B.O.*, 644 S.W.3d at 664; *Abshire*, 563 S.W.3d at 226; *Palacios*, 46 S.W.3d at 879–80.

Dr. Wills argues Dr. Cascone was required to provide a standard of care for "a physician who did not examine the patient but only co-signed a note. Or, at least, Cascone was required to provide some explanation that the identical standard of care was applicable to Dr. Wills under his specific circumstances." Dr. Wills further contends that he did not "directly participate" in Mendoza's care because he only cosigned the nurse practitioner's note and collaborated on the assessment and plan portion of that note after Valbuena examined Mendoza and Dr. Cascone mischaracterizes this conduct as "direct particip[ation]" in Mendoza's care. Dr. Wills also argues that Dr. Cascone's opinion that "identical standard[s of care] appl[y] to all defendants is in direct conflict with Cascone's reiteration of the facts" in his reports, and this Court can infer from the facts set forth in his reports that Dr. Cascone's opinion on the applicable standard of care is inaccurate. Dr. Wills' arguments are not persuasive.

As previously discussed, Dr. Cascone articulated a standard of care "for surgical site infection diagnosis and treatment" that he opines applies to *all* physicians and he explains that this standard applies to all physicians, including Dr. Wills, because these are "basic medical skills learned by all physicians as part of

their basic medical training." Thus, Dr. Cascone's reports explain why he believes the defendants, including Dr. Wills, share similar standards of care with respect to Mendoza's medical treatment despite their differing specialties and the specific roles they played in her care.[5] *See Gray*, 189 S.W.3d at 859 (recognizing that while identical standards of care can apply to more than one health care provider, "such generic statements, without more, can reasonably be deemed conclusory"); *see generally Sanjar v. Turner*, 252 S.W.3d 460, 467 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("nothing . . . explicitly forbids applying the same standard of care to more than one physician if, as in the present case, they all owed the same duty to the patient").

While Dr. Wills argues that we can infer that Dr. Cascone's opinion on the applicable standard of care is inaccurate, courts are not at liberty to draw inferences when assessing the sufficiency of a Chapter 74 expert report. *See Wright*, 79 S.W.3d at 53 (stating reviewing courts cannot draw inferences and are limited to information

---

[5] Dr. Wills' assertion that Dr. Cascone "applied identical standards of care to each provider, regardless of their role" is not supported by the record. Although there is considerable overlap among the standards of care applicable to Dr. Wills and the other defendants, Dr. Cascone also modified these standards depending on Mendoza's clinical presentation and the facts in existence when the defendants treated Mendoza. For example, unlike when Dr. Wills treated Mendoza on June 8, 2019, the physicians who treated Mendoza on June 9, 2019 had access to the results of Mendoza's wound GMS, which showed white blood cells and Gram-negative rods, and unlike Dr. Wills, the standard of care also required those physicians to evaluate the findings of the GMS.

contained within four corners of expert's report). Moreover, whether Dr. Cascone's opinion is correct or even reasonable is not relevant with respect to whether his opinion constitutes a good-faith effort to meet the statute's requirements. *See Miller*, 536 S.W.3d at 516–17 (stating reasonability of expert's opinion "is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort"). Similarly, although Dr. Wills challenges the accuracy of Dr. Cascone's opinions, the facts that he relies upon, and the factual inferences he has drawn from those facts, those issues are not before us at this stage of the litigation. *See Abshire*, 563 S.W.3d at 226 (stating "ultimate evidentiary value" of expert's opinions "is a matter to be determined at summary judgment and beyond" and faulting court of appeals for "improperly examin[ing] the merits of the expert's claims" when assessing sufficiency of expert report); *see also Clavijo v. Fomby*, No. 01-17-00120-CV, 2018 WL 2976116, at *10 (Tex. App.—Houston [1st Dist.] June 14, 2018, pet. denied) (mem. op.) ("Whether an expert's factual inferences made in the expert report are accurate is an issue for summary judgment, not a Chapter 74 motion to dismiss."). Furthermore, to the extent Dr. Cascone's expert reports are inconsistent or contradictory, as Dr. Wills argues, the trial court was within its discretion to resolve any such inconsistencies. *See Albo v. Bahn*, No. 01-17-00409-CV, 2018 WL 2204295, at *4 (Tex. App.—Houston [1st Dist.] May 15, 2018, no pet.) (mem. op.) ("An expert report that contains inconsistent or contradictory statements, however,

may still constitute a good-faith effort to comply with Chapter 74's expert report requirements.") (citing *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 144 (Tex. 2015)).

After reviewing Dr. Cascone's reports as a whole, we conclude that the trial court reasonably could have determined that these reports represent a good-faith effort to inform Dr. Wills of the applicable standards of care and the ways in which he allegedly breached those standards. *See E.D. by & through B.O.*, 644 S.W.3d at 664; *Abshire*, 563 S.W.3d at 226; *Palacios*, 46 S.W.3d at 879–80. Therefore, the trial court did not abuse its discretion by denying Dr. Wills' Chapter 74 motion to dismiss on the ground that Dr. Cascone's reports were deficient as to standard of care and breach. *See E.D. by & through B.O.*, 644 S.W.3d at 664; *see also Larson*, 197 S.W.3d at 304 (stating when reviewing for abuse of discretion, "[c]lose calls must go to the trial court").

## D.     Causation

Dr. Wills argues that Dr. Cascone's reports are insufficient as to causation because Dr. Cascone's opinion is conclusory, and he fails to link Mendoza's alleged injury to any specific act or omission by Dr. Wills.[6]

---

[6]     Dr. Wills also argues without elaboration that Dr. Cascone "fails to communicate the requisite foreseeability and cause-in-fact elements of causation."

### 1. Applicable Law

To address causation, an expert report must explain how and why the defendant's breach of the standard of care proximately caused the plaintiff's injury. *See E.D. by & through B.O.*, 644 S.W.3d at 664 (citing *Abshire*, 563 S.W.3d at 224). The expert "must explain the basis of his statements and link conclusions to specific facts" and provide enough information from which the trial court could reasonably conclude that the claim has merit. *Abshire*, 563 S.W.3d at 223, 226. The explanation must be factual because "without factual explanations, the reports are nothing more than the ipse dixit of the experts, which . . . are clearly insufficient." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017); *see also Abshire*, 563 S.W.3d at 224 ("A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts."). An expert report is only required to provide notice of what conduct forms the basis for the plaintiff's complaints; it is not required to prove a defendant's liability at this early stage of the litigation. *Apodaca v. Russo*, 228 S.W.3d 252, 255 (Tex. App.—Austin 2007, no pet.); *see also Abshire*, 563 S.W.3d at 224 (stating "the expert need not prove the entire case or account for every known fact" to satisfy "how and why" requirement). "An expert may show causation by explaining a chain of events that begins with a defendant doctor's negligence and ends in injury to the plaintiff." *Head v. Hagan*, 600 S.W.3d 375, 379 (Tex. App.—

Tyler 2019, no pet.) (citing *McKellar v. Cervantes*, 367 S.W.3d 478, 485 (Tex. App.—Texarkana 2012, no pet.)).

Proximate cause has two components: (1) foreseeability and (2) cause in fact. *Zamarripa*, 526 S.W.3d at 461. An expert report "need not use the words proximate cause, foreseeability, or cause in fact" and its "adequacy does not depend on whether the expert uses any particular magical words." *Id.* at 460 (internal quotations omitted); *see also Wright*, 79 S.W.3d at 53 ("[A] report's adequacy does not depend on whether the expert uses any particular 'magical words.'"). A health care provider's breach is a foreseeable cause of the plaintiff's injury if a health care provider of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Curnel v. Hous. Methodist Hosp.–Willowbrook*, 562 S.W.3d 553, 562 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing *Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.] 2006, pet. denied)). "For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—*i.e.*, but for the act or omission—the harm would not have occurred." *Zamarripa*, 526 S.W.3d at 460 (citation omitted).. "[A] defendant's act or omission need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." *Bustamante v. Ponte*, 529 S.W.3d 447, 457 (Tex. 2017).

## 2. Analysis

Dr. Wills argues that Dr. Cascone's causation opinions are conclusory and Dr. Cascone does not link Dr. Wills' acts or omissions to Mendoza's alleged injury, and instead, Dr. Cascone merely asserts that "each identified breach contributed to and is causally linked to Ms. Mendoza's injuries regardless of when the breach occurred."

In his reports, Dr. Cascone opines that Mendoza developed a surgical site infection and abscess on June 7, 2019. Although Mendoza "had indisputable signs and symptoms of a post-operative surgical site infection and wound necrosis on June 8, 2019," Dr. Wills did not (1) examine Mendoza's abdominal wall incision, (2) order blood cultures, a chest x-ray, and advanced imaging of Mendoza's abdomen, (3) start Mendoza on empiric intravenous broad-spectrum antibiotics, and (4) obtain infectious disease and general surgery consultations, and these omissions deviated from the applicable standard of care.

Dr. Cascone then draws a line directly connecting Dr. Wills' omissions to Mendoza's injuries. According to Dr. Cascone, Mendoza's existing surgical cite infection would have been identified if Dr. Wills had examined Mendoza's abdominal wall incision and ordered blood cultures and advanced imaging of Mendoza's abdomen on June 8, 2019. He further opines that if Dr. Wills had started Mendoza on empiric intravenous broad-spectrum antibiotics on June 8, 2019,

Mendoza's infection "would have been curtailed," and had Dr. Wills had obtained an infectious disease and general surgery consult on June 8, 2019, Mendoza's "developing infection would have been addressed through debridement."

Dr. Cascone states that Dr. Wills' failure to identify and curtail Mendoza's surgical wound infection on June 8, 2019 caused Mendoza's abdominal surgical wound infection and the abscess, which began forming on June 7, 2019, to progressively worsen, which led to the "involvement of the abdominal cavity and hernia mesh along with worsening of the abdominal wound necrosis." Mendoza's worsening surgical wound infection caused her to develop a 10-centimeter intraabdominal abscess which was filled with necrotic tissue by June 12, 2019. Mendoza had to undergo "multiple abdominal surgeries for wound debridement, abscess debridement, and lysis of adhesions" because of her large intraabdominal abscess. Dr. Cascone further opines that these surgeries caused Mendoza to develop "intra-abdominal adhesions, formation of abdominal wall scar tissue and damage of abdominal wall nerve tissue," which caused Mendoza to suffer "permanent abdominal pain and neuropathy."

In his supplemental report, Dr. Cascone explains that all physicians learn about surgical site infection diagnosis and treatment as part of their basic medical training. He explains that surgical site infections develop when bacteria contaminate the wound and cause "inflammation and infection" to develop. The host's body

responds by sending white blood cells to the site to eradicate the bacteria and prevent it from replicating and the combination of the bacteria and white blood cells causes purulence to develop. The inflammation and purulence cause abscesses and adhesions to develop and "tissue death (i.e. necrosis)." The necrosis, in turn, "facilitates bacterial replication and inflammation." Dr. Cascone explains that "the infection will continue to progress leading to growth of the abscess and more adhesion formation" if the inflammation, necrosis, and purulence are untreated or not properly treated. According to Dr. Cascone, the worsening infection and tissue damage "is progressively occurring continuously and for this reason, each identified breach contributed to and is causally linked to Ms. Mendoza's injuries regardless of when the breach occurred." According to Dr. Cascone, "[e]ach individual breach of the applicable standards, alone and in combination, contributed to the end result because of the continuously and progressively worsening pathophysiology of a surgical site infection."

Having done so, Dr. Cascone's reports provide a factually supported explanation of "how and why" Dr. Wills' breaches caused Mendoza's injuries. *See E.D. by & through B.O.*, 644 S.W.3d at 664 (stating report adequately addresses causation when expert explains "how and why" breach of standard caused injury in question by "explain[ing] the basis of his statements and link[ing] conclusions to specific facts") (quoting *Abshire*, 563 S.W.3d at 224)). Dr. Cascone also provided

facts sufficient to demonstrate that a physician of ordinary intelligence would have anticipated the danger that Mendoza's abdominal surgical site infection and abscess would continue to progressively worsen and grow in size and scope such that abdominal surgeries would be required to address the condition, and that such surgeries would result in permanent abdominal pain and neuropathy, when he failed to examine Mendoza's abdominal wall incision, order blood cultures, a chest x-ray, and advanced imaging of Mendoza's abdomen, start Mendoza on empiric intravenous broad-spectrum antibiotics, and obtain infectious disease and general surgery consultations for Mendoza. *See Curnel*, 562 S.W.3d at 562 (stating breach is foreseeable cause of plaintiff's injury if health care provider of ordinary intelligence would have anticipated danger caused by negligent act or omission). The fact that Dr. Cascone describes some of his opinion on causation with respect to all of the defendants, including Dr. Wills, does not alter this conclusion because a negligent act or omission "need not be the sole cause of an injury, as long as it is a substantial factor in bringing about the injury." *Bustamante*, 529 S.W.3d at 457.

Dr. Wills contends that Dr. Cascone does not provide enough facts to sufficiently explain how any of the standards of care he ascribes to Dr. Wills caused Mendoza's injuries. In particular, Dr. Wills argues the reports are deficient as to causation because Dr. Cascone does not state what a thorough history and physical examination, blood cultures, chest x-ray, or "unspecified advanced imaging" would

have shown that would have changed the outcome in this case. Dr. Wills also faults Dr. Cascone for the not identifying the empiric IV antibiotic that should have been ordered, when it should have been ordered, or explaining how it would it have affected the outcome. He also faults Dr. Cascone for not identifying the type of bacteria that caused the infection, "when was it evident, and what medication was it susceptible to that was not ordered." An expert report, however, does not need to contain such detailed information to provide a fair summary of the expert's opinions on causation. *See Abshire*, 563 S.W.3d at 227 (stating report that did not "designate a specific documentary procedure that should have been used" was not deficient as to causation because such detail "is simply not required at this stage of the proceedings") (quoting *Baty*, 543 S.W.3d at 697); *Naderi v. Ratnarajah*, 572 S.W.3d 773, 781–82 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (rejecting argument expert report was deficient as to causation because expert did not "identify what antibiotics should have been used, if it would have made a difference which were used and the timing of use, or anything else that would clarify the what, why, and when of antibiotics"; "[A]n expert report is not required to contain that level of detail at this early stage of the litigation.").

After reviewing Dr. Cascone's reports as a whole, we conclude the trial court reasonably could have determined Dr. Cascone's reports constituted a good-faith effort to provide a fair summary of Dr. Cascone's opinion regarding how Dr. Wills'

alleged breaches of the applicable standard of care caused Mendoza's injuries. *See E.D. by & through B.O.*, 644 S.W.3d at 662 (citing TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6)). Thus, the trial court did not abuse its discretion by denying Dr. Wills' motion to dismiss on the ground that Dr. Cascone's reports were deficient as to causation. *See id.*; *see also Larson*, 197 S.W.3d at 304 (stating when reviewing for abuse of discretion, "[c]lose calls must go to the trial court").

We overrule Dr. Wills' challenges to the sufficiency of Dr. Cascone's reports.

### Conclusion

We affirm the trial court's order denying Dr. Wills' motion to dismiss.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Kelly, Rivas-Molloy, and Guerra.