**Reversed and Remanded and Opinion filed April 13, 2023.**



In The

# Fourteenth Court of Appeals

## NO. 14-22-00270-CV

## CODY BERNARD, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF PAUL BERNARD; AND BLAKE BERNARD, Appellants

## V.

## CHI ST. LUKE'S HEALTH — THE WOODLANDS HOSPITAL; YASIR ELHAWI, M.D.; AND HEINE RUIZ, M.D., Appellees

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2020-53620**

## O P I N I O N

Appellants Cody Bernard, individually and as representative of the Estate of Paul Bernard, and Blake Bernard (together, the "Bernard Appellants") filed health care liability claims stemming from the death of their father. Appellees CHI St. Luke's Health — The Woodlands Hospital, Yasir Elhawi, M.D., and Heine Ruiz, M.D. (collectively, "Appellees") filed motions to dismiss, challenging the sufficiency of the Bernard Appellants' expert report. *See* Tex. Civ. Prac. & Rem.

Code Ann. § 74.351. The trial court granted the motions, dismissed the Bernard Appellants' claims with prejudice, and assessed attorney's fees. For the reasons below, we reverse these orders and remand the case for further proceedings.

## BACKGROUND

Paul Bernard was admitted to St. Luke's Hospital on August 24, 2018, complaining of dysuria and abdominal pain. Paul was treated and discharged from the hospital on September 3, 2018. Two days later, Paul suffered cardiac arrest and died.

Approximately two years after Paul's death, the Bernard Appellants sued CHI St. Luke's Health — The Woodlands Hospital,[1] Memorial Hermann Health System, Dr. Heine Ruiz, Dr. Yasir Elhawi, and Dr. Alexander Kadin. Asserting claims stemming from Paul's death, the Bernard Appellants alleged that the defendants failed to assess Paul's risk of pulmonary embolism and failed to prescribe or administer necessary prophylactic measures. To support their health care liability claims, the Bernard Appellants served Appellees with Dr. Mark Murray's expert report and curriculum vitae. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).

Appellees filed individual motions to dismiss challenging the sufficiency of Dr. Murray's expert report. The Bernard Appellants filed a response and argued that Dr. Murray's expert report satisfied the statutory requirements. In the alternative, the Bernard Appellants requested a 30-day extension to amend the

---

[1] In its original answer, appellee CHI St. Luke's Health — The Woodlands Hospital asserted that the Bernard Appellants incorrectly named St. Luke's Community Health Services and CHI St. Luke's Health Baylor College of Medicine Medical Center as defendants. On appeal, the Bernard Appellants similarly use "CHI St. Luke's Health — The Woodlands Hospital" to refer to these entities. Accordingly, this opinion also uses "CHI St. Luke's Health — The Woodlands Hospital" to refer to defendants St. Luke's Community Health Services and CHI St. Luke's Health Baylor College of Medicine Medical Center.

2

expert report if the trial court concluded it was deficient.

On April 2, 2021, the trial court signed two orders granting the motions to dismiss filed by CHI St. Luke's Health — The Woodlands Hospital and Dr. Elhawi. The trial court signed a third order on April 23, 2021, granting Dr. Ruiz's motion to dismiss the Bernard Appellants' health care liability claim.

Appellees filed individual motions requesting their attorney's fees and costs. The Bernard Appellants filed a motion to reconsider the denial of their request for a 30-day extension to amend Dr. Murray's report. The trial court held a hearing on the motions and, afterwards, signed three separate orders granting each Appellee their fees and costs. The trial court also denied the Bernard Appellants' request for a 30-day extension. The Bernard Appellants timely filed a notice of interlocutory appeal.[2] *See id.* § 51.014(a)(10).

### ANALYSIS

The Bernard Appellants raise three issues on appeal:

1. Dr. Murray's expert report satisfies the statutory requirements;
2. if Dr. Murray's report does not satisfy the statutory requirements, any deficiencies are curable and the trial court abused its discretion by denying the Bernard Appellants' request for a 30-day extension to amend the report; and
3. the evidence is insufficient to support Appellees' attorney's fees awards.

Appellees each filed an individual appellate response. We consider the Bernard Appellants' issues below, beginning with the sufficiency of Dr. Murray's report.

---

[2] Defendants Memorial Hermann Health System and Dr. Alexander Kadin are not parties to this appeal.

## I. Overview of Governing Law and Standard of Review

The Texas Medical Liability Act requires that plaintiffs alleging a health care liability claim serve each defendant with an expert report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a); *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 511 (Tex. 2017) (per curiam). An adequate expert report provides a "fair summary" of the expert's opinions regarding (1) the applicable standards of care, (2) the manner in which the care rendered failed to meet those standards, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (per curiam). In determining whether an expert's report makes this showing, we are limited to the report's four corners. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010); *C-HCA, Inc. v. Cornett*, 635 S.W.3d 295, 299 (Tex. App.—Houston [14th Dist.] 2021, no pet.).

"[T]he purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire*, 563 S.W.3d at 223. Accordingly, it is not necessary that the expert report marshal all the plaintiff's proof; rather, an expert report is adequate if it constitutes a "good faith effort" to comply with the statutory requirements. *Id*; *see also Tex. Children's Hosp. v. Knight*, 604 S.W.3d 162, 169 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). This requires that the report "(1) inform[] the defendant of the specific conduct called into question, and (2) provid[e] a basis for the trial court to conclude the claims have merit." *E.D. v. Tex. Health Care, P.L.L.C.*, 644 S.W.3d 660, 664 (Tex. 2022) (per curiam). At this stage of litigation, "whether the expert's explanations are 'believable' is not relevant to the analysis of whether the expert's opinion constitutes a *good-faith*

4

*effort* to comply" with the Texas Medical Liability Act. *Id.* (emphasis in original).

We review a trial court's decision to grant or deny a motion to dismiss based on the adequacy of an expert report for an abuse of discretion. *Abshire*, 563 S.W.3d at 223. The trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). "[U]nder an abuse of discretion standard, close calls must go to the trial court." *E.D.*, 644 S.W.3d at 664.

## II.      Sufficiency of Dr. Murray's Report

In the trial court, Appellees raised the same challenge to Dr. Murray's expert report and alleged that his collective allegations were not specific enough as to each individual Appellee with regard to the required elements of standard of care, breach, and causation. With these complaints in mind, we summarize the law governing each element before examining whether Dr. Murray's report met these requirements.

### A.      A "Good Faith" Effort to Comply with Statutory Requirements

As set out above, an expert report must provide a fair summary of the expert's opinions regarding the applicable standards of care, the manner in which those standards were breached, and the causal relationship between the breach and the injury, harm, or damages claimed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l), (r)(6); *Abshire*, 563 S.W.3d at 223.

Standard of care is defined by what an ordinarily prudent physician or health care provider would have done under the same or similar circumstances. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001); *Naderi v. Ratnarajah*, 572 S.W.3d 773, 779 (Tex. App.—Houston [14th Dist.]

5

2019, no pet.).  Identifying the standard of care is critical because whether a health care provider breached a duty of care cannot be determined without specific information about what the defendant should have done differently.  *Abshire*, 563 S.W.3d at 226; *Palacios*, 46 S.W.3d at 880.  However, the stated standard of care need not be complicated for it to be sufficient.  *See Baty v. Futrell*, 543 S.W.3d 689, 697 (Tex. 2018); *see also Patel v. Baker*, No. 14-21-00177-CV, 2022 WL 1633802, at *2 (Tex. App.—Houston [14th Dist.] May 24, 2022, pet. denied) (mem. op.).

An expert report's sufficiency as to the breach element is tied to its sufficiency identifying the applicable standard of care.  *See Baty*, 543 S.W.3d at 697.  Based on the facts set out in the report, an expert must explain how and why a health care provider's breach of the standard of care caused the injury.  *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459 (Tex. 2017).

Finally, with respect to causation, a conclusory statement is inadequate; rather, the expert must explain the basis for his statements and link conclusions to specific facts.  *E.D.*, 644 S.W.3d at 664.  Satisfying the "how and why" standard does not require that the expert prove the entire case or account for every known fact — rather, a report is sufficient if it makes "a good-faith effort to explain, factually, how proximate cause is going to be proven."  *Id.*  Proximate cause has two components:  (1) foreseeability, and (2) cause-in-fact.  *Humble Surgical Hosp., LLC v. Davis*, 542 S.W.3d 12, 23 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

When a plaintiff sues more than one health care provider, the expert report must set forth the standard of care for each provider and explain the causal relationship between each provider's individual acts and the claimed injury.  *Golucke v. Lopez*, 658 S.W.3d 686, 693 (Tex. App.—El Paso 2022, no pet.);

6

*Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 748 (Tex. App.—Houston [14th Dist.] 2011, no pet.). This does not mean, however, that an expert report concluding that multiple health care providers owed the same standard of care and breached the standard in the same manner can never constitute a good faith effort at compliance with the Texas Medical Liability Act. *See, e.g.*, *Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 367-68 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (expert report was sufficient even though it "applied the same standard of care" to the doctor and his staff because it "explain[ed] why" that standard was appropriate). But if an expert report concluding that different health care providers are collectively negligent is to constitute a good faith effort, it must explain why, under the particular circumstances, the providers owed the same standard of care to the plaintiff and breached that duty in the same manner. *Golucke*, 658 S.W.3d at 693; *see also Tex. Health Harris Methodist Hosp. Fort Worth v. Biggers*, No. 02-12-00486-CV, 2013 WL 5517887, at *6-7 (Tex. App.—Fort Worth Oct. 3, 2013, no pet.) (mem. op.); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

## B. Content of Dr. Murray's Report

In his expert report, Dr. Murray states that "[t]he same standard of care applies to all" Appellees. Continuing on, the report explains: "[Appellees] are grouped together because these healthcare providers owed the same duties to Paul Bernard — each individual defendant in this group of [Appellees] is held to the same standard of care."

Dr. Murray's report delineates five standards of care collectively applicable to Appellees:

- Pulmonary embolism protocol: Dr. Murray opines that Appellees should have adopted a policy to aid in the identification of patients at

risk for pulmonary embolism.

- Identification of pulmonary embolism risk factors:  According to Dr. Murray, an appropriate pulmonary embolism risk identification policy would have incorporated the Caprini risk assessment model.[3]

- Communication between providers:  Dr. Murray's report states that Appellees were required to "communicate with each other and work together as a team in rendering medical care to Paul Bernard."  Dr. Murray identifies three specific components of this communication: (1) discussing the patient's chart, test results, and risk factors; (2) reviewing the patient's medical history and available medical records that may indicate pulmonary embolism risk factors; and (3) communicating a patient's pulmonary embolism risk factors to all providers rendering care.

- Proper anticoagulants:  According to Dr. Murray, "[o]nce it is determined that a patient is at high risk for [pulmonary embolism], proper measures must be taken to reduce the risk both during the stay and upon discharge."  Dr. Murray identifies two measures that would have been appropriate to take with respect to Paul's care: (1) prescribing and providing a sequential compression device[4]; and (2) prescribing and administering chemical anticoagulants, such as Lovenox at a dosage of 40 milligrams upon discharge and a twice daily 5 milligram dosage thereafter.

- Patient education:  Dr. Murray states that Appellees were required "to educate their patient Paul Bernard regarding his risk for [pulmonary embolism] and the life-threatening consequences of developing" a pulmonary embolism.  Specifically, Dr. Murray opines that Appellees were "required to explain the importance of the proper regimen for prevention of [pulmonary embolism] and the reasons for the anticoagulants prescribed."

With respect to breach, Dr. Murray opines that Appellees collectively failed to

---

[3] Describing the Caprini model, Dr. Murray states that it "assesses a [pulmonary embolism] risk score based on certain factors," including advanced age, having been confined to a bed for at least 72 hours, and sepsis.

[4] Dr. Murray describes a sequential compression device as follows:  A device "shaped like sleeves that wrap around the legs and inflate with air one at a time.  This imitates walking and helps prevent blood clots."

follow these five standards of care.

Finally, with respect to causation, Dr. Murray describes the following chain of events:

- Pulmonary embolism is a blockage in one of the pulmonary arteries found in the lungs. In most cases, a pulmonary embolism is caused by a blood clot traveling to the lungs from veins in the legs or other parts of the body.

- "In all reasonable medical probability, a blood clot developed in Paul Bernard's legs after he was discharged" by Appellees. The clot "traveled into his lungs, blocking one of his pulmonary arteries," and resulted in "cardiac arrest."

- "[H]ad [Appellees] followed the appropriate standards of care, this would not have happened, and Paul would still be alive." Following the described standards of care "prevents the formation of blood clots that travel in the lungs."

- Specifically, the standards of care "act collectively to preclude clotting of the blood. The mechanical coagulation methods imitate walking and ensure that blood is constantly flowing, which precludes development of clots. The chemical methods reduce the likelihood that blood will clot. Combined these anticoagulant methods significantly reduce and can eliminate the development of" pulmonary embolisms.

- Appellees' "failure to follow these standards of care proximately caused Paul's death." If Appellees had adhered to the appropriate standards of care, "in all reasonable medical probability Paul would not have developed the [pulmonary embolism] that ultimately led to his death."

## C. Application

We conclude that Dr. Murray's report provides a fair summary of his opinions regarding the applicable standards of care, how those standards were breached, and the causal relationship between the breaches and Paul's death. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l), (r)(6); *Abshire*, 563 S.W.3d at 223.

9

Linking conclusions to specific facts, Dr. Murray adequately explained how and why the alleged breaches caused Paul's death.

However, the trial court reasonably could have concluded that Dr. Murray's expert report failed to adequately tie his conclusions regarding these elements to the actions of individual health care providers. *See Golucke*, 658 S.W.3d at 693; *Kingwood Pines Hosp., LLC*, 362 S.W.3d at 748. In his report, Dr. Murray states that the collective allegations are appropriate "because these healthcare providers owed the same duties to Paul Bernard." But Dr. Murray's expert report fails to explain *why* these different health care providers owed the same duties and breached them in the same manner. *See Golucke*, 658 S.W.3d at 693; *Tex. Health Harris Methodist Hosp. Fort Worth*, 2013 WL 5517887, at *6-7; *Gray*, 189 S.W.3d at 859. This explanation is particularly necessary when, as here, the Bernard Appellants have asserted claims against different types of health care providers: a hospital and two physicians.

A similarly-deficient report was examined in *Golucke*, in which the plaintiff filed suit after she fell while recuperating from knee replacement surgery. 658 S.W.3d at 690. The plaintiff asserted health care liability claims against multiple defendants, including five health care entities and four individual nurses. *Id*. The plaintiff's expert report identified multiple standards of care that were breached, including completion of a thorough nursing assessment of the level of fall risk, provision of a safe environment to prevent accidents, and use of a "wheelchair" or "bed" alarm to alert nurses to assist the plaintiff if she attempted to get out of bed. *Id*. at 694-95. The expert report applied these standards of care uniformly across all the defendants without specifying which actions or omissions each entity or nurse was responsible for. *Id*. at 694, 700.

One of the nurses challenged the sufficiency of the expert report and the trial

10

court denied her motion to dismiss. *Id.* at 691. Reversing the denial, the appellate court held that the report lacked "an explanation on what [the nurse] herself did wrong or failed to do, such as to indicate how she breached the standard of care applicable to her individually." *Id.* at 696. Continuing on, the court noted that the expert report "fails to explain, identify, or describe any specific conduct that is attributable to [the nurse]. Instead, the report leaves us attempting to infer which individual was involved in the breaches identified." *Id.* at 697. "Without explaining what [the nurse] was doing, what she should have been doing, or how she was connected to the care and monitoring of [the plaintiff], the report fails to make a causal connection between any individual act of [the nurse] and [the plaintiff's] injury sustained from falling." *Id.* at 700; *see also Tex. Health Harris Methodist Hosp. Fort Worth*, 2013 WL 5517887, at *6 (the expert's report was inadequate because it "fail[ed] to explain how a tissue bank, a hospital, and a neurosurgeon would have identical standards of care as to the preservation and storage of a bone flap").

Here too, Dr. Murray's expert report did not specifically implicate any individual Appellee's acts or omissions in the care provided to Paul. Likewise, in its discussion of the applicable standards of care, breaches, and causal relationship, the expert report only refers to the Appellees collectively — it does not assign any specific acts or omissions to any individual Appellee. Nor does the report explain *why* it is appropriate to group the Appellees in this manner, leaving us to speculate as to each Appellee's involvement. *See Golucke*, 658 S.W.3d at 694-700.

Because of this deficiency with respect to the collective allegations in Dr. Murray's report, the trial court did not abuse its discretion in granting Appellees' motions to dismiss the Bernard Appellants' claims. *See E.D.*, 644 S.W.3d at 664; *Abshire*, 563 S.W.3d at 223. We overrule the Bernard Appellants' first issue.

11

## III. Entitlement to a 30-Day Extension

In their second issue, the Bernard Appellants assert that any deficiencies in Dr. Murray's expert report are curable and, therefore, the trial court abused its discretion by denying their request for a 30-day extension to amend the report.

If the plaintiff asserting a health care liability claim timely serves an expert report and the trial court concludes the report represents an objective good faith effort to comply with the applicable statutes but nevertheless is deficient in some way, the trial court has the discretion to grant the plaintiff one 30-day extension to cure the deficiencies. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c). We review the trial court's ruling on a motion for an extension to cure a deficient expert report for an abuse of discretion. *Henry v. Kelly*, 375 S.W.3d 531, 535 (Tex. App.— Houston [14th Dist.] 2012, pet. denied).

The trial court "must grant an extension if a report's deficiencies are curable." *Columbia Valley Healthcare Sys., L.P.*, 526 S.W.3d at 461. The Texas Supreme Court established a "minimal" standard for determining whether a deficient report is curable: "a 30-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated." *Scoresby v. Santillan*, 346 S.W.3d 546, 557 (Tex. 2011); *Univ. of Tex. Health Sci. Ctr. at Houston v. Joplin*, 525 S.W.3d 772, 782 (Tex. App.—Houston [14th Dist.] 2017, pet. denied); *see also Samlowski v. Wooten*, 332 S.W.3d 404, 416 (Tex. 2011) (Guzman, J., concurring) ("[i]n order to preserve the highest number of meritorious claims, trial courts should err on the side of granting claimants' extensions"); *Samlowski*, 332 S.W.3d at 411 (plurality op.) (agreeing with the concurrence that the trial court should err on the side of granting an extension).

Here, Dr. Murray's report satisfies this standard. First, the report was served by the statutory deadline. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). Second, the report contains the opinion of a person with expertise that the claim has merit, *i.e.*, Dr. Murray. Dr. Murray's curriculum vitae (which was included with the expert report) demonstrates that he has expertise in the areas implicated by the facts of this case. Dr. Murray received his medical degree in 1993 and completed a residency in internal medicine. Dr. Murray spent five years serving as an active-duty physician in the United States Air Force and, thereafter, worked as an emergency room physician. Dr. Murray currently is affiliated with several health care groups and health systems. This experience provides a foundation sufficient to support Dr. Murray's opinion that the Bernard Appellants' health care liability claims have merit. *See Scoresby*, 346 S.W.3d at 557.

Finally, Dr. Murray's report implicates Appellees' conduct in Paul Bernard's death. As set forth above, Dr. Murray's report provides a fair summary of his opinions regarding the applicable standards of care, the alleged breaches of those standards, and the consequences thereof. Dr. Murray sufficiently explained how and why the alleged breaches caused Paul Bernard's death. The only deficiency in Dr. Murray's report stems from the collective nature of the allegations — Dr. Murray failed to specifically assign certain acts or omissions to the individual Appellees or explain why they are subject to the same standards. *See Golucke*, 658 S.W.3d at 694-700. But this deficiency does not render his report incurable. *See Scoresby*, 346 S.W.3d at 557.

Given the Supreme Court's minimal standard and the Bernard Appellants' objective good faith efforts to comply with the statutory requirements governing expert reports, we cannot say that Dr. Murray's expert report was incurable. Therefore, we hold that the trial court abused its discretion by denying the Bernard

Appellants' request for a 30-day extension to cure Dr. Murray's expert report. *See, e.g.*, *Guerrero v. Karkoutly*, No. 13-20-00053-CV, 2020 WL 5056511, at \*3-4 (Tex. App.—Corpus Christi Aug. 27, 2020, pet. denied) (mem. op.); *Curnel v. Houston Methodist Hosp.-Willowbrook*, 562 S.W.3d 553, 569-70 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Wheeler v. Methodist Richardson Med. Ctr.*, No. 05-17-00332-CV, 2017 WL 6048153, at \*3-4 (Tex. App.—Dallas Dec. 7, 2017, pet. denied) (mem. op.). We sustain the Bernard Appellants' second issue.

## IV.  Attorney's Fees

When a plaintiff fails to file an expert report as to a health care liability defendant, the trial court has no discretion but to dismiss the claims asserted against that defendant with prejudice and award the defendant costs and attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b). Here, after the trial court granted Appellees' motions to dismiss, it awarded each Appellee its costs and fees.

Because we conclude the trial court abused its discretion by denying the Bernard Appellants' request for a 30-day extension, we likewise reverse the trial court's orders awarding Appellees their costs and fees. We sustain the Bernard Appellants' third issue.

### CONCLUSION

We reverse the trial court's (1) April 2, 2021 orders granting the motions to dismiss filed by CHI St. Luke's Health — The Woodlands Hospital and Dr. Elhawi, and (2) April 23, 2021 order granting Dr. Ruiz's motion to dismiss. We also reverse the trial court's denial of the Bernard Appellants' request for a 30-day extension to cure their expert report and its orders awarding Appellees their fees

14

and costs. We remand this case with instructions for the trial court to grant a 30-day extension under Texas Civil Practice and Remedies Code section 74.351(c).


/s/    Meagan Hassan
       Justice


Panel consists of Justices Bourliot, Hassan, and Poissant.

15